IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**BERT ANTHONY VEAL,**                          Case No. 5:17 CV 455

    Plaintiff,                                  Chief Judge Patricia A. Gaughan

    v.                                          Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                  REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Bert Anthony Veal ("Plaintiff") filed a Complaint against the Commissioner of

Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny

supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C.

§§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report

and recommendation pursuant to Local Rule 72.2. (Non-document entry dated March 6, 2017).

Following review, and for the reasons stated below, the undersigned recommends the decision of

the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI in December 2013, alleging a disability onset date of March 1, 2008.

(Tr. 393-98). His claims were denied initially and upon reconsideration. (Tr. 339-42, 348-52).

Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 353-54).

Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the

ALJ on September 22, 2015. (Tr. 274-306). On November 24, 2015, the ALJ found Plaintiff not

disabled in a written decision. (Tr. 251-68). The Appeals Council denied Plaintiff's request for

review, making the hearing decision the final decision of the Commissioner. (Tr. 1-7); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on March 6, 2017. (Doc. 1).

## FACTUAL BACKGROUND

Personal and Vocational Background

Plaintiff was born in 1966 and was 49 years old on the alleged date of disability. (Tr. 281, 393). He has a high school education and attended technical school, where he studied electronic repair. (Tr. 281). At the time of the hearing, he lived with his girlfriend. (Tr. 284).

*Plaintiff's Testimony*

Plaintiff testified he performed some housework, including sweeping the floor and porch, and washing the dishes. (Tr. 285). He stated he was unable to mow the yard because "my legs [are] not strong [sic] as they used to be and my back gives me a lot of problems now." (Tr. 285-86). He did not shop often due to "panic attacks when I get in a place that's like a lot of people." (Tr. 288). Plaintiff's girlfriend would drive him to visit with his mother once a week (Tr. 290), and his nine-year-old granddaughter visited him "all the time" (Tr. 297).

Plaintiff stated he had COPD, "bronchitis flare up[s] every now and then", neck and back pain, and a liver lesion. (Tr. 286). He could sit or stand for approximately a half hour before he would need to change positions. (Tr. 292). Plaintiff estimated he was able to walk one block. (Tr. 293). He stated he could lift a gallon of milk and a 10-pound bag of potatoes, but could not lift a 10-pound bag in each hand simultaneously. *Id.* He had trouble breathing when walking and when exposed to "chemicals and stuff", including oven cleaner. (Tr. 293-94).

He used the inhaler Symbicort twice a day due to his breathing difficulty. (Tr. 286-87). Plaintiff stated his doctor advised him to quit smoking, but at that time he was smoking half a pack of cigarettes a day. (Tr. 287). He also admitted to smoking marijuana, but added that he "[didn't]

puff on them hard." (Tr. 295). He testified he suffered from vision problems in his right eye and could not see out of his right eye without glasses. (Tr. 291). With his glasses on, he was able to see to his right side. *Id.* He was able to hear with the assistance of hearing aids. *Id.*

Plaintiff testified he saw therapist Ms. Sloane at Portage Path at least once a month for "some mental things that I go to them and talk to them about like sometimes - - sometimes I hear stuff." (Tr. 287-88). He added that he experience auditory hallucinations every day and visual, hallucinations for which he was prescribed medication. (Tr. 288).

During an average day, Plaintiff stayed at home and watched television. (Tr. 290). He watched movies, but could not remember the endings because his concentration was "not all that good." (Tr. 290-91).

Relevant Medical Evidence

*Physical Impairments*

In April 2013, Plaintiff underwent an auditory evaluation with Steven L. Kutnick, M.D., for the Ohio Rehabilitation Services Commission. (Tr. 477). Dr. Kutnick noted Plaintiff had normal hearing in his left ear and moderately severe hearing loss in the right due to an injury sustained when he was a child. *Id.* Dr. Kutnick recommended a hearing aid for his right ear. *Id.*

In October 2013, Plaintiff complained of worsening neck and back pain for a few months. (Tr. 498-501). Ekaete Jackson, M.D. noted: "Wants me to fill form stating that he cant [sic] work. He's been evaluated for possible work training to enable him gain [sic] employment, by his social agency. States he does not want to do this, [sic] because if he starts working he may loose [sic] his opportunity to get disability and SSI for back pain." (Tr. 498). Following an examination, Dr. Jackson assessed Plaintiff with a muscle spasm in his neck and lower back pain. (Tr. 499-500). Dr. Jackson noted Plaintiff had a normal ability to climb on the examination table and a normal

ability to change positions smoothly. (Tr. 499). Dr. Jackson recommended physical therapy, but noted: "[patient] stating he does not want to do [physical therapy], [sic] because he does not want to work." (Tr. 500). He therefore notified Plaintiff that he would complete the form, but his assessment would be based on his examination and diagnosis, which indicated Plaintiff had no injuries or medical conditions precluding him from working. *Id.*

On January 10, 2014, Plaintiff saw Eric Panzner, D.O., for, among other things, low back and neck pain. (Tr. 493). Plaintiff told Dr. Panzner he had tried physical therapy for his chronic neck and back pain, but it "didn't help." *Id.* Under "Functional Status", Dr. Panzner noted: "Able to feed self, Able to bathe self, Able to use the toilet independently, Able to dress self, Able to get up from bed or chair without assistance". *Id.* A back examination revealed: an ability to climb on exam table normally, ability to change positions smoothly, normal range of motion, with the exception of pain when bending laterally and rotating, and a normal straight leg raise test. (Tr. 495). Dr. Panzner assessed Plaintiff with back pain with radiation and neck pain. (Tr. 496). He advised Plaintiff to resume normal activities, continue stretching, and "use of cooling to painful areas". *Id.*

Plaintiff had a follow-up appointment for neck and back pain in February 2014. (Tr. 580). He had a normal gait, decreased range of motion in the neck and lower back, good muscle strength in all extremities, no spinous process tenderness in the back or neck, and negative straight leg raise tests. (Tr. 582). The clinician recommended regular home exercises, stretching, use of cooling, and prescribed gabapentin. *Id.*

In March 2014, at another follow-up appointment, Plaintiff again complained of back pain. (Tr. 591). He had a normal posture, normal gait, climbed onto the examination table normally, and had a normal ability to change positions smoothly. (Tr. 592). He also had neck and lumbar spine

4

tenderness, normal neck and lumbar spine range of motion, and normal straight leg raises. *Id.* Raul Raudales, M.D., recommended medication, stretching exercises, and use of cooling. (Tr. 593).

At an appointment on April 29, 2014, in addition to complaints of neck and back pain, Plaintiff reported numbness and tingling in his legs at night. (Tr. 648). He had a normal gait and posture. (Tr. 649). Aside from cervical muscle tenderness, a neck examination revealed no abnormalities and a negative Spurling's sign test. *Id.* He was able to climb on the exam table normally and change positions normally. (Tr. 649-50). A back examination revealed Plaintiff low back tenderness, and a normal straight leg raising test. (Tr. 649-50).

In May 2014, Dr. Panzner reviewed an MRI of Plaintiff's back. (Tr. 645-46). The impression was: "[n]o evidence of disc herniation or spinal stenosis", "[m]ild bilateral foraminal stenosis L5-S1 level", and a mass in the right lobe of the liver. (Tr. 646). Dr. Panzner advised Plaintiff to follow up on the liver mass, and to quit smoking. *Id.*

Plaintiff returned to Dr. Panzner in June 2014, because he "need[ed] disability paperwork filled out". (Tr. 642). He reported medication helped his pain. *Id.* He "[a]ppear[ed] comfortable" on examination. (Tr. 643). Dr. Panzner prescribed a TENs unit and recommended pain management. (Tr. 644). Plaintiff requested switching providers to Dr. Franz because he wanted a "DO" physician. *Id.* A few weeks later, Plaintiff reported to Dr. Panzner that the TENs unit helped his back pain, but he had not yet established care with pain management. (Tr. 637). An MRI of Plaintiff's cervical spine revealed minimal degenerative changes. *Id.*

In August 2014, Plaintiff saw James Franz, D.O. (Tr. 634). Plaintiff stated his pain had been stable, with moderate improvement, on ibuprofen. *Id.* Plaintiff had a normal gait, neck tenderness with normal range of motion, and thoracic and lumbar spine tenderness with normal range of motion. (Tr. 635). He also had diffuse paraspinal tenderness and pain with neck range of

5

motion and bending forward. *Id.* Dr. Franz recommended regular physical and aerobic activity, and flexibility exercises. (Tr. 636).

In October 2014, Plaintiff established care with Andrea A. Jopperi, D.O. (Tr. 724). Plaintiff reported no anxiety or depression (Tr. 725). A physical examination showed Plaintiff was: in no acute distress, pleasant, well developed, well nourished, and well groomed. *Id.* He had a normal gait, normal deep tendon reflexes, and no swelling in his extremities. (Tr. 726). Dr. Jopperi assessed Plaintiff with, among other things, chronic neck and back pain. *Id.* She prescribed pain medication and told Plaintiff if he required something stronger, she would refer him to pain management. *Id.*

Plaintiff had a follow-up appointment with Dr. Jopperi on February 2, 2015. (Tr. 720). He complained of a sharp pain under his right rib cage, as well as sinus congestion and drainage. *Id.* Dr. Jopperi continued Plaintiff's pain medication for chronic neck and back pain, and advised him to follow up in three months. (Tr. 722).

In May 2015, Plaintiff had a follow-up appointment with Dr. Jopperi, and complained of depression; a depression screening resulted in a finding of "mild depression". (Tr. 713). Plaintiff reported no change in his neck and back pain, and stated he took tramadol and Flexeril regularly, but took ibuprofen only when his pain got "really bad". *Id.* Plaintiff stated he did not want to quit smoking, and he indicated his cough and shortness of breath improved with medication. *Id.* Dr. Jopperi assessed Plaintiff with: GERD, chronic neck and back pain, and chronic obstructive pulmonary disease ("COPD"). (Tr. 715).

*Mental Impairments*

At an appointment with counselor September Sloane at Portage Path Behavioral Health in September 2012 to "resume treatment" Plaintiff stated: "I need you [Portage Path] to fill out a

paper that says why I can't work." (Tr. 574-75). Ms. Sloane explained the paperwork could not be completed until Plaintiff had been seen on a regular and consistent basis for at least four to six months. (Tr. 574). She noted Plaintiff was alert and oriented, with fair insight and judgment, and logical thoughts. *Id.* He was cooperative, with a constricted blunted affect, and an anxious and depressed mood. *Id.* Plaintiff had average mental activity, was adequately groomed, maintained average eye contact, and spoke clearly. *Id.* He reported anxiety, panic attacks, poor sleep, and "seeing shadows", and Ms. Sloane noted he had no cognitive impairment, no delusions, and no hallucinations. *Id.*

At a therapy session at Portage Path in November 2012 with Ms. Sloane, she noted Plaintiff had "still not come in for a psych[ological] eval[uation]" because he had not "felt like being bothered" and had transportation problems. (Tr. 571). Ms. Sloane informed Plaintiff that if he did not follow treatment recommendations, his symptoms would not improve. *Id.* Plaintiff complained of continued depression and anxiety, and poor focus and concentration. *Id.* He had financial and physical health stressors. *Id.*

In January 2013, Plaintiff saw Ms. Sloane at Portage Path for an unscheduled therapy session to "update [the] clinician on what he has been doing". (Tr. 569). A mental status examination showed Plaintiff was adequately groomed with average eye contact, and clear speech. *Id.* He reported no cognitive impairments, delusions, or hallucinations. *Id.* Plaintiff demonstrated an appropriate affect, cooperative behavior, and euthymic mood. *Id.* He was alert and oriented, with fair judgment and logical thoughts. *Id.* Later in January 2013, Plaintiff had an appointment with Ms. Sloane, who noted he "worked cooperatively with [the] clinician to complete Treatment Plan." (Tr. 567).

7

In February 2013, Plaintiff saw Ms. Sloane at an unscheduled walk-in appointment. (Tr. 566). He demonstrated a depressed mood, constricted/blunted affect, and cooperative behavior. *Id.* He reported significant housing issues. *Id.* The progress note stated he was scheduled for a psychological evaluation later that day. *Id.*

Plaintiff underwent a psychiatric evaluation with practitioner Judith K. Stanovic on February 19, 2013, at Portage Path. (Tr. 544-47). A mental status examination revealed he had average activity, average eye contact, and clear speech. (Tr. 545). Plaintiff reported auditory hallucinations, but no delusions; and demonstrated a full affect, cooperative behavior, depressed mood. *Id.* He was alert and oriented, with poor insight, fair judgment, and logical thoughts. *Id.* He was given a principal diagnosis of major depressive disorder (recurrent moderate). (Tr. 546). She prescribed Remeron and advised him to follow up with therapy and "advised of medication walk in clinic as needed between [appointments] if experience adverse effects from his medication". (Tr. 545).

Plaintiff saw Ms. Sloane again a few days later. (Tr. 565). He stated the medication helped his symptoms and improved his sleep. *Id.* At a medication management appointment on March 19, 2013, Plaintiff reported sleeping "much better", but feeling "depressed sometimes". (Tr. 563).

Plaintiff had another medication management appointment in May 2013. (Tr. 559-60). He stated he was "doing well" and had "no concerns with [his] mental health". (Tr. 559). He had a "bright affect" and "no issues impacting [his] mental health". *Id.* His mood was stable, and he was sleeping well. *Id.* A mental status examination revealed Plaintiff was alert and oriented, with good insight, good judgment, and logical thoughts. *Id.*

Plaintiff saw Ms. Sloane again on September 30, 2013. (Tr. 553). He was adequately groomed, with average eye contact and clear speech. *Id.* He reported he missed his last medication management appointment, and was experiencing visual and auditory hallucinations. *Id.*

At a medication management appointment in November 2013, Plaintiff had average activity, average eye contact, and spoke clearly. (Tr. 550). He had a full affect, cooperative behavior, fair insight, good judgment, logical thoughts, and was alert and properly oriented. *Id.* The clinician "[e]ncouraged increased exercise". *Id.*

On January 22, 2014, Plaintiff had a therapy session with Ms. Sloane. (Tr. 548). He demonstrated average mental activity, was adequately groomed, made average eye contact, and spoke clearly. *Id.* He reported no cognitive impairments, delusions, or hallucinations. *Id.* Plaintiff was alert and oriented with fair judgment and insight, and logical thoughts. *Id.* He demonstrated a constricted/blunted affect, cooperative behavior, and a depressed mood. *Id.*

At a therapy session with Ms. Sloane on March 5, 2014, Plaintiff had average mental activity, was adequately groomed, made average eye contact, and spoke clearly. (Tr. 622). He reported no cognitive impairment, delusions, or hallucinations. *Id.* Plaintiff was alert and oriented, with fair insight, fair judgment, and logical thoughts. *Id.* He demonstrated a constricted/blunted affect, cooperative behavior, and an anxious and depressed mood. *Id.*

The following month, Plaintiff saw Ms. Sloane again; the mental status examination results were unchanged. (Tr. 672).

In May 2014, Plaintiff saw a new therapist at Portage Path, Ramone Ford. (Tr. 667). He showed average mental activity, average eye contact, and spoke clearly. *Id.* Plaintiff reported no cognitive impairment, and demonstrated an appropriate affect, depressed mood, and cooperative behavior. *Id.* He was alert and oriented with fair insight and logical thoughts. *Id.*

9

At a medication management appointment in July 2014, Plaintiff reported he was "doing well in terms of his depression, which is under control." (Tr. 665). He stated his medication Remeron was "working fine". *Id.*

Plaintiff did not show up for an individual therapy appointment on September 4, 2014 (Tr. 662), and cancelled a therapy appointment on October 20, 2014 (Tr. 658). At a therapy session with Ms. Sloane on December 16, 2014, Plaintiff reported feeling stressed and depressed. (Tr. 711). He had financial issues, his mother was ill, and he had recently had hernia surgery. *Id.*

Hearing Testimony

*VE's Testimony*

The ALJ first asked the VE to consider a hypothetical individual "with no past jobs" and the following limitations:

> The hypothetical individual would fall within the exertional category of light with the following further restrictions: the hypothetical individual would be limited to frequent bilateral reaching overhead and all around; such individual would on occasion be required to climb ramps and stairs; never climb ladders, scaffolds, or ropes; occasionally balance, stoop, kneel, crouch, and crawl; the hypothetical individual would be limited insofar as they would be restricted from hazards such as heights or machinery; be able to avoid ordinary hazards in a workplace such as boxes on the floor, doors ajar, approaching people or vehicles; the hypothetical individual would need to avoid concentrated exposure to dust, fumes, gases, and poorly- ventilated areas; such individual would be limited to simple tasks, limited to routine and repetitive tasks; would not be able to perform at a production rate pace such as that of an assembly line worker, but could perform goal-oriented work such as that as an office cleaner; the hypothetical individual would be further limited so far as they would be limited to simple work-related decisions with occasional interaction with coworkers; in regards to the coworkers, a small group of individuals and the contact would be casual in nature; the hypothetical individual would be limited so far as they'd have occasional interaction with the public. In regards to that interaction . . . the interaction would be superficial in nature and by superficial, I mean that if a member of the public were to approach the individual and ask the nearest location of a restroom, they could provide that information but that''d be about the extent of interaction. And, finally, ma'am, the hypothetical individual would be limited to tolerating few changes in the routine work setting. However, when said changes take place, they need to take place gradually and infrequently.

(Tr. 301-02).

The VE determined this individual could perform the jobs of mail clerk, assembler of electrical components, and ticket marker. (Tr. 302-03). In making this decision, the ALJ relied upon both her experience and the dictionary of occupational titles. ("DOT"). (Tr. 303). In response to further hypothetical questions, the VE noted the individual could still perform these positions if he could not be required to work in a job where sharing was required for safety, or where binocular vision was required. (Tr. 303-04).

Opinion Evidence

*Treating Sources*

<u>Ms. Sloane</u>

On April 22, 2014, Ms. Sloane completed a "Medical Source Assessment (Mental)". (Tr. 620-21). The form prompted Ms. Sloane to make a check mark next to a number from one to five for various categories, which corresponded with certain limitations. *Id.* Ms. Sloane checked "4" or "5" for every category of mental functioning. Id. A "5" corresponded to "not able to perform designated task or function on regular, reliable, and sustained schedule", and a "4", corresponded to "able to perform designated task or function, but has or will have noticeable difficulty (distracted from job activity) more than 20 percent of the work day or work week (i.e. more than one hour and up to two hours/day or one-half to one day/week)". (Tr. 620). She also noted Plaintiff would be absent from work more than four days per month, due to severe and chronic symptoms relating to his diagnoses of depression, anxiety, and post-traumatic stress disorder. (Tr. 621).

11

On September 4, 2015, Ms. Sloane completed a second "Medical Source Assessment (Mental)". (Tr. 740-42). Ms. Sloane checked "5" for seventeen[1] of the twenty categories. *Id.* She rated two of the three remaining categories, a "4". *Id.* Ms. Sloane rated the remaining category a "3", meaning "able to perform designated task or function, but has or will have noticeable difficulty (distracted from job activity) from 11-20 percent of the work day or work week (i.e. more than one hour/day or more than one-half day/week)". *Id.* Ms. Sloane indicated Plaintiff would miss more than four days of work per month and would need to take unscheduled breaks more than four times per day. (Tr. 741).

### Dr. Jopperi

On September 15, 2015, Dr. Jopperi completed a physical functional capacity assessment. (Tr. 743). She indicated Plaintiff was capable of: lifting and carrying up to ten pounds occasionally and five pounds frequently; standing or walking for one hour during an eight-hour workday and for 30 minutes at a time. *Id.* Dr. Jopperi added Plaintiff's ability to sit was not affected by his impairments. *Id.* She indicated Plaintiff could never climb, balance, stoop, crouch, kneel, or crawl because Plaintiff "states his back gets stuck when he bends over." *Id.* Dr. Jopperi assessed environmental restrictions due to Plaintiff's COPD, and stated he would be absent from work more than four days per month, be off task over twenty percent of a workday, and could use his hands for only half of the day. (Tr. 743-44). Dr. Jopperi added Plaintiff would not need to lie down throughout the course of an eight-hour workday and would not require unscheduled breaks. (Tr. 744).

---

1. She rated category "16. Maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness" a "5", but added in the margin "3-4 cleanliness". (Tr. 741).

12

<u>Dr. Daugherty</u>

On July 31, 2014, ophthalmologist Christopher Daugherty, M.D., completed a "Vision Medical Source Statement". (Tr. 624-25). Dr. Daugherty stated that due to a right eye impairment, Plaintiff "would have trouble locating objects approaching from the right eye", which would pose a risk of him bumping into low hanging objects. (Tr. 625).

*Consultative Examiners*

<u>Dr. File</u>

On March 7, 2014, Plaintiff underwent an "Ophthalmological/Optometric Consultative Examination" with Mary File, M.D. (Tr. 609-12). With correction, Plaintiff had 20/60 vision in the right eye and 20/20 in the left. (Tr. 609). Dr. File opined Plaintiff should not climb heights or work with heavy machinery. (Tr. 610).

<u>Dr. Dallara</u>

Robert F. Dallara, Jr., Ph.D., conducted a "Psychological Evaluation" on March 12, 2014. (Tr. 614-18). Dr. Dallara determined Plaintiff could understand and apply instructions in a work setting consistent with borderline intellectual abilities. (Tr. 618). Dr. Dallara indicated there was no evidence from the examination to suggest Plaintiff had an impairment in maintaining persistence or pace, as he was able to track the flow of conversation and did not show easy distractibility. (Tr. 618). Dr. Dallara indicated Plaintiff would have some difficulties relating to others due to his depression and anxiety. *Id.* Dr. Dallara noted Plaintiff did not describe a history of mental or emotional deterioration in response to work, but stated he would have some difficulties with stress and pressure associated with daily work. *Id.*

13

*State Agency Reviewers*

<u>Mental Impairments</u>

On March 26, 2014, state agency psychologist Leslie Rudy, Ph.D., determined Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 313). Dr. Rudy noted that while "few problems [were] seen at [the] [consultative examination], [he] may have some difficulties relating to others and coping appropriately with work stress and pressures." (Tr. 314). Dr. Rudy stated Plaintiff retained the ability to understand and remember one to two-step tasks and familiar three to four-step tasks with no more than moderate production quotas and time limitations (Tr. 318). Dr. Rudy also concluded Plaintiff was able to engage in simple, infrequent, and superficial interactions with customers or co-workers. (Tr. 319). She added Plaintiff would not easily adapt to frequent changes or jobs requiring significant travel or delivery tasks. *Id.*

On May 5, 2014, a second state agency psychologist Todd Finnerty, Psy.D., reviewed the record and made functional limitation findings consistent with those of Dr. Rudy. (Tr. 329-30, 333-35).

<u>Physical Impairments</u>

On March 18, 2014, state agency reviewer Esberdado Villanueva, M.D., reviewed the record and determined Plaintiff could: occasionally lift or carry fifty pounds; frequently lift or carry twenty-five pounds; stand, walk, or sit for a total of about six hours in an eight-hour workday; frequently climb stairs or ramps, kneel, crouch, or crawl; occasionally climb ladders, ropes, or scaffolds, and stoop; was able to balance without limitation; had visual limitations with his right

eye; should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; and should avoid all exposure to hazards. (Tr. 315-17).

On May 2, 2014, a second state agency reviewer, William Bolz, M.D., reviewed the record and made the same findings as Dr. Villanueva. (Tr. 331-33).

ALJ Decision

On November 24, 2015, the ALJ issued an unfavorable written decision, making the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since August 14, 2013, the application date.

2. The claimant has the following severe impairments: bilateral hearing loss, chronic obstructive pulmonary disease (COPD), history of cone dystrophy, borderline intellectual functioning, dysthymic disorder, panic disorder and mild spondylosis at C4-5 and C5-6.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant cannot climb ladders, ropes or scaffolds. The claimant can no more than occasionally climb ramps or stairs, stoop, kneel, crouch or crawl. He can frequently reach in all directions. The claimant must avoid all exposure to workplace hazards such as unprotected heights, or hazardous machinery, but is able to avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar or approaching people or vehicles. The claimant must avoid concentrated exposure to fumes, odors, dusts, gases and poorly ventilated areas. He can hear and understand simple oral instructions, communicate simple information and make simple, work-related decisions. He is limited to occasional, casual interaction with a small group of coworkers. He is limited to occasional, superficial contact with the public. The claimant can tolerate few and infrequent changes in a routine work setting. When said changes occur, they would need to take place gradually. He is restricted to jobs where hearing is not required for safety and binocular vision is not required.

5. The claimant has no past relevant work.

6.  The claimant was born on April 16, 1966 and was 47 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.  The claimant has at least a high school education and is able to communicate in English.

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since August 14, 2013, the date the application was filed.

(Tr. 967-84) (internal citations omitted).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

17

meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff asserts the ALJ erred in three ways: (1) by failing to state valid reasons for rejecting the opinions of treating sources; (2) by improperly assessing his credibility; and (3) by failing to create an accurate RFC at Step Five of the sequential evaluation. The Commissioner responds substantial evidence supports the ALJ's findings and the Court should affirm the decision. For the reasons discussed below, the undersigned recommends the Court affirm the ALJ's decision.

Treating Physician Rule

Plaintiff first argues the ALJ erred in his evaluation of opinions from Dr. Jopperi, Dr. Daugherty, Dr. Dallara, and counselor September Sloane (Doc. 13, at 13-18), and by instead relying on the opinions of the state agency reviewers, submitted "prior to the submission of most of the medical and psychological evidence in the record"[2], *id.* at 14.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective

---

2. This brief assertion is not well taken. An ALJ may rely on a state agency reviewer who did not review the entire record, so as long as the ALJ also considers the evidence post-dating the opinion. *See McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009); *Ruby v. Colvin*, 2015 WL 1000672, *4 (S.D. Ohio) ("[S]o long as an ALJ considers additional evidence occurring after a state agency physician's opinion, he has not abused his discretion."). Here, it is clear the ALJ considered the state agency physicians' opinions along with subsequent evidence.

medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by: (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009); *see also Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006) (holding ALJ adequately addressed opinion by indirectly attacking both its consistency and supportability with other record evidence).

Social Security regulations state that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). A "medical opinion" is defined by regulation as a "statement[] from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairments . . . ." *Id.* at § 404.1527(a)(2). "Acceptable medical sources" includes licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. *Id.* at § 404.1513(a)(1)–(5). The relevant Social Security Regulation also explains:

> The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. See 20 CFR 404.1513(a) and 416.913(a). Second, only "acceptable medical sources" can give us medical opinions. See 20 CFR 404.1527(a)(2) and 416.927(a)(2). Third, only "acceptable medical sources" can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight. See 20 CFR 404.1527(d) and 416.927(d).
>
> Making a distinction between "acceptable medical sources" and medical sources who are not "acceptable medical sources" facilitates the application of our rules on establishing the existence of an impairment, evaluating medical opinions, and who can be considered a treating source.

SSR 06–03p, 2006 WL 2329939, at *2. Opinions from those who are not "acceptable medical sources"—or as the regulations define them, "other sources"—may be used by an ALJ to "show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. § 404.1513(d); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Other source opinions are entitled to consideration by an ALJ, and an ALJ's decision should reflect such consideration. *Cole v. Astrue,* 661 F.3d 931, 939 (6th Cir. 2011); *see also* SSR 06–03p, 2006 WL 2329939, at *3 (opinions from "other sources" "are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file"). In other words, an ALJ "should explain the weight given to [such]

opinions . . . or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06–03p, 2006 WL 2329939, at *6; *see also Cruse,* 502 F.3d at 541.

However, "SSR 06–03p . . . does not require that an adjudicator articulate 'good reasons' for the rejecting of an 'other source's' opinion [,]" as the ALJ must do when discounting an opinion by a treating source. *York v. Comm'r of Soc. Sec.,* 2014 WL 1213240, at *5 (S.D. Ohio) (citations omitted); *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. 2014) ("An ALJ must consider other-source opinions and 'generally should explain the weight given to opinions for these 'other sources[.]'") (alteration in original). To evaluate other source opinions, an ALJ may apply the factors set forth in 20 C.F.R. § 404.1527(c), *i.e.,* length of treatment history; consistency of the opinion with other evidence; supportability; and specialty or expertise in the medical field related to the individual's impairments. *Adams v. Colvin*, 2014 WL 5782993, at *8 (S.D. Ohio); SSR 06-03p, 2006 WL 2329939, at *4 ("[T]hese same factors [in 20 C.F.R. § 404.1527] can be applied to opinion evidence from 'other sources.'").

*Dr. Jopperi*

In his written opinion, the ALJ gave the following explanation for assigning Dr. Jopperi's opinions little weight:

> While Dr. Jopperi treated the claimant, her opinions are not well supported by her clinical findings or those of prior treating physicians. She saw the claimant on three occasions between October 2014 and May 2015; however, Dr. Jopperi's progress notes do not reflect any positive clinical findings associated with the claimant's complaints of neck or back pain. She consistently observed the claimant's normal gait and deep tendon reflexes. Dr. Jopperi did not note the claimant's tenderness to palpation, diminished range of motion, motor weakness or sensory deficits (19F/3, 9, 14). Therefore, the undersigned gave Dr. Jopperi's opinions little weight.

(Tr. 264).

21

The ALJ's reasoning speaks to the factors of length of treatment relationship, frequency of examination, nature and extent of the treatment relationship, supportability of the opinion, and consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2). There is substantial evidence in the record to support the ALJ's conclusion Dr. Jopperi's extreme limitations are not supported by her own treatment notes or the record as a whole.

First, as the ALJ addressed, the three progress notes from Dr. Jopperi show Plaintiff was in no acute distress, pleasant, well developed, well nourished, and well groomed. (Tr. 715, 721, 725-26). He also had a normal gait, normal deep tendon reflexes, and no swelling or tenderness in his extremities. (Tr. 715, 725-26) At the appointment in October 2014, with regard to his neck pain, Plaintiff denied radiation of pain, tingling, numbness, or weakness. (Tr. 724). With regard to his back pain, he complained of radiation of pain, stating "his legs fe[lt] heavy at night and a little numb" a few times a week. *Id.* However, a physical examination showed normal results; and Dr. Jopperi once again prescribed pain medication, "told him that if he needs something strong than what he is on [she] would refer him to pain [management]", and advised him to follow up in three months. (Tr. 726). In fact, at each of the three appointments—in October 2014, February 2015, and May 2015—Dr. Jopperi prescribed pain medication and advised Plaintiff to follow up in three months for his chronic neck and back pain. (Tr. 715, 722, 725-26). The Sixth Circuit has approved reliance upon a claimant's conservative treatment record as a reason to discount a medical opinion. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016) ("The ALJ noted that the records indicate Kepke received only conservative treatment for her ailments, a fact which constitutes a 'good reason' for discounting a treating source opinion"); *Lester v. Comm'r of Soc. Sec.*, 596 F. App'x 387, 389 (6th Cir. 2015) (finding ALJ reasonably discounted a doctor's proposed limitations because, among other things, the claimant received conservative treatment);

22

*Francis*, 414 F. App'x at 806 ("the ALJ reasonably viewed Francis's limited treatment as inconsistent with Dr. Wakham's opinion"); *see also* 20 C.F.R. § 1527(c)(2)(ii) ("We will look at the treatment the source has provided . . . . ").

Second, there is substantial evidence in the record to support the ALJ's assertion that Dr. Jopperi's opinion was not supported by other evidence in the record, namely that from prior treating physicians. At an October 2013 appointment with Dr. Jackson, Plaintiff had a normal ability to climb on the examination table and a normal ability to change positions smoothly. (Tr. 499). Dr. Jackson recommended physical therapy, which he noted Plaintiff did not wish to participate in because he did not want to work, and agreed to complete disability paperwork but stated it would be based on his examination and diagnosis which showed Plaintiff had no medical conditions precluding him from work. (Tr. 500). Following an examination of Plaintiff's neck and back in January 2014, resulting in largely normal results (Tr. 495), Dr. Panzner advised Plaintiff to resume normal activities, continue stretching, and to "use cooling to pain painful areas." (Tr. 496). At an appointment in February 2014, a clinician found Plaintiff had a normal gait, decreased range of motion in the neck and lower back, good muscle strength in all extremities, no spinous process tenderness in the back or neck, and negative straight leg raise tests. (Tr. 582). The clinician prescribed medication, and advised Plaintiff to do regular home exercises, stretch, and cooling. *Id.* Plaintiff complained of pain in March 2014, but Dr. Raudaules noted he had a normal posture, normal gait, could climb onto the examination table normally, and had a normal ability to change positions smoothly. (Tr. 592). Plaintiff also demonstrated normal neck and lumbar spine range of motion, and normal straight leg raises. *Id.* Dr. Raudales recommended medication, stretching exercises, and use of cooling. (Tr. 593). In April 2014, Plaintiff complained of numbness and tingling in his legs at night. (Tr. 648). However, Dr. Panzner found he had a normal gait and

23

posture, a negative Spurling's sign test, normal straight leg raises, and he was able to climb on the exam table normally and change positions normally. (Tr. 649-50). Dr. Panzner noted a May 2014 MRI of Plaintiff's back showed [n]o evidence of disc herniation or spinal stenosis", and "[m]ild bilateral foraminal stenosis L5-S1 level". (Tr. 646). An MRI of Plaintiff's cervical spine revealed minimal degenerative changes. (Tr. 637). In August 2014, Dr. Franz noted Plaintiff had a normal gait, neck tenderness with normal range of motion, and thoracic and lumbar spine tenderness with normal range of motion. (Tr. 635). Dr. Franz recommended regular physical and aerobic activity, and flexibility exercises. (Tr. 636). Therefore, there is substantial evidence in the record supporting the ALJ's conclusion Dr. Jopperi's opinion was not supported by the findings of other treating sources.

Third, while the undersigned recognizes that it is possible Plaintiff's medical impairments worsened over time, Dr. Jopperi's own treatment notes suggest this is not the case. *See* Tr. 713-16, 720-27). Although Plaintiff points to contradictory evidence in the record (Doc. 13, at 16-17), even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. The ALJ did not err in discounting Dr. Jopperi's opinion because he provided good reasons for giving it little weight.

*Dr. Dallara*

Plaintiff briefly alleges the ALJ erred in failing to account for Dr. Dallara's opined limitations in the RFC, when the ALJ assigned that opinion "great weight". (Doc. 13, at 17).

This argument is unavailing. The undersigned finds the ALJ did account for Plaintiff's mental impairments in the RFC by limiting Plaintiff in the following ways:

> He can hear and understand simple oral instructions, communicate simple information and make simple, work-related decisions. He is limited to occasional,

casual interaction with a small group of coworkers. He is limited to occasional, superficial contact with the public. The claimant can tolerate few and infrequent changes in a routine work setting. When said changes occur, they would need to take place gradually.

(Tr. 258).

Even so, an ALJ does not err by failing to adopt verbatim an opinion to which he has assigned great weight. *See Smith v. Colvin*, 2013 WL 6504681, at *11 (N.D. Ohio) (finding an ALJ who attributes "great weight" to state-reviewing psychologist opinions not required to include in claimant's RFC all limitations assessed by them). There is a difference between medical opinions and an RFC finding. The ALJ, not a medical source, is tasked with making the latter determination. *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)).The two assessments are not synonymous, and need not be identical to be compatible. SSR 96-5p, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the [RFC] assessment."). Thus, the ALJ did incorporate the limitations into the RFC, and he was not required to do so verbatim.

*Dr. Daugherty*

With regard to Dr. Daugherty's opinion, the ALJ concluded:

Christopher Daugherty, M.D. completed a medical source statement regarding the claimant's visual impairment on July 31, 2014. He indicated that the claimant's conditions of the right eye, rod-cone dystrophy and macular edema, meet some of the criteria of listing 2.00; however, he identified no abnormalities of the claimant's vision in the better, left eye. Dr. Daugherty concluded that the claimant would have difficulty locating objects approaching from the right and anticipating low-hanging objects or obstacles on the right (11F). Dr. Daugherty's conclusions are consistent with the claimant's history of impaired visual acuity and field of vision of the right eye. His conclusions were given great weight in the assessment of the environmental limitations incorporated into the residual functional capacity.

(Tr. 264).

25

Contrary to Plaintiff's assertion (Doc. 13, at 13), the ALJ gave this opinion "great weight" and reasonably accounted for it in the RFC by limited Plaintiff's exposure to environmental hazards and restricting him to jobs where binocular vision is not required. (Tr. 258).

> The claimant must avoid all exposure to workplace hazards such as unprotected heights, or hazardous machinery, but is able to avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar or approaching people or vehicles. The claimant must avoid concentrated exposure to fumes, odors, dusts, gases and poorly ventilated areas. * * * He is restricted to jobs where hearing is not required for safety and binocular vision is not required.

*Id.*

The ALJ did not err in his analysis of Dr. Daugherty's opinion, as he incorporated the findings into the RFC.

*Counselor September Sloane*

The ALJ analyzed Ms. Sloane's opinion is follows:

> Ms. Sloan's [sic] opinions are not supported by objective findings described in her progress notes. While she consistently noted the claimant's depressed or anxious mood and constricted or blunted affect on examination, Ms. Sloan [sic] uniformly described the claimant as cooperative with average eye contact and psychomotor activity, clear speech, fair insight and judgment and logical thought processes. She routinely noted no impairment of the claimant's cognition, delusions or hallucinations (4F, 14Fand 18F). Ms. Sloan's [sic] conclusions are also inconsistent with the claimant's conservative treatment. Were the claimant as functionally impaired as Ms. Sloan's [sic] statement suggests, one might expect changes to his treatment regimen. However, the claimant's treatment by Ms. Sloan [sic] and others at Portage Path Behavioral Health has remained remarkably consistent during the period for adjudication. No changes were made to the claimant's medication regimen after February 2013 and the frequency of his therapy visits has declined over time. For these reasons, the undersigned gave Ms. Sloan's [sic] opinions little weight.

(Tr. 264-65).

As a treating counselor, Ms. Sloane is considered an "other source" under the rules. 20 C.F.R. §416.913(d). While Plaintiff argues the ALJ erred in his treating physician analysis, he does not directly challenge the ALJ's analysis of Ms. Sloane's opinion, but rather challenges the ALJ's

statement Plaintiff attended only thirteen therapy sessions in twenty nine months, when he actually attended twenty-four session. (Doc. 13, at 15-16). He adds that the facility, not Plaintiff, cancelled some of the sessions. *Id.* The Commissioner responds that some of the additional sessions Plaintiff cites were actually only routine medication management appointments (not therapy appointments), which the ALJ addressed earlier in the opinion, and even if he was incorrect in the number of sessions Plaintiff attended, "the ALJ's overarching conclusion that Plaintiff's conservative course of treatment did not support disabling mental limitations remains". (Doc. 14, at 17-18). The undersigned agrees with the Commissioner.

The ALJ stated:

> The conservative nature of the claimant's mental health care is inconsistent with his allegations as to the severity of his depression and anxiety. Since February 2013, the claimant has been treated with Remeron for reported difficulty sleeping, depression and anxiety (4F, 14F and 18F). He reported that Remeron was effective, based on his diminished anxiety while in public, as early as May 2013 (4F/ 16-17). He has reported improved sleep with Remeron or simply indicated that the medication is working "ok"(4F/ 22, 24; 14F/8 and 18F/5). No other medications were prescribed to the claimant during the course of treatment. In addition to medication, the claimant has participated in *individual psychotherapy*. [emphasis added]. However, his participation has been sporadic. From September 2012 to February 2015, a period of twenty-nine months, the claimant attended a total of thirteen therapy sessions (4F, 14Fand 18F). He has cancelled or simply failed to appear at scheduled therapy sessions since February 2015 (18F/2, 3). He has not required emergency room treatment or inpatient psychiatric care.

> The claimant's history of mental health treatment for complaints of depression and anxiety supports the mental limitations set forth in the residual functional capacity. However, the conservative treatment modalities offered to the claimant, his reports as to the effectiveness of such treatment and the absence of strongly positive and regularly noted clinical findings indicative of more significant psychological impairment fail to support his alleged functional limitations.

(Tr. 263).

First, the ALJ did appropriately calculate Plaintiff's individual psychotherapy sessions during the time period between September 2012 and February 2015. During this period, Plaintiff

27

had, as the ALJ stated, 13 scheduled, individual psychotherapy sessions. *See* Tr. 574 (September 12, 2012), Tr. 571 (November 14, 2012), Tr. 567 (January 30, 2013), Tr. 566 (February 19, 2013), Tr. 565 (February 21, 2013), Tr. 553-54 (September 30, 2013), Tr. 548 (January 22, 2014), Tr. 622-23 (March 5, 2014), Tr. 672-73 (April 8, 2014), Tr. 667-68 (May 30, 2014), Tr. 663-64 (July 28, 2014), Tr. 711-12 (December 16, 2014), Tr. 701 (February 13, 2015). The undersigned recognizes Plaintiff did have two, unscheduled sessions during this period, *see* Tr. 570 (November 29, 2012) & Tr. 569 (January 17, 2013). The remaining appointments Plaintiff cites to for support the ALJ erred, are all medication management appointments, not individual psychotherapy sessions. See Doc. 13, at 15-16 (citing Tr. 563-65 (March 19, 2013), Tr. 559-60 (May 8, 2013), Tr. 550-51 (November 27, 2013), Tr. 671 (April 30, 2014), Tr. 669 (May 6, 2014), Tr. 665-66 (July 24, 2014), Tr. 659-60 (October 6, 2014), Tr. 709-10 (December 29, 2014), Tr. 698-99 (February 23, 2015)). Additionally, Plaintiff points out some of the sessions were cancelled by staff, not Plaintiff. Indeed, staff at Portage Path did cancel some appointments, *see e.g.* Tr. 555, 556, 561, but others were cancelled by Plaintiff or he simply did not show up to scheduled appointments, *see, e.g.* Tr. 658, 662, 696, 697.

Second, the undersigned finds the ALJ thoroughly analyzed the treatment records from Portage Path, including Ms. Sloane's records, and addressed the factors of supportability and consistency in concluding her opinion was entitled to little weight. *Adams,* 2014 WL 5782993, at *8; SSR 06-03p, 2006 WL 2329939, at *4. This is sufficient. Plaintiff does not challenge the remainder of the ALJ's assessment, only that the ALJ erred calculating the number visits at Portage Path. This argument is not well-taken and the undersigned finds the ALJ did not err in his analysis of the opinion from this "other source". *See Brewer v. Astrue*, 2012 WL 262632, at *10 (N.D. Ohio 2012) ("SSR 06-3p does not include an express requirement for a certain level of analysis that

28

must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'").

Credibility Assessment

When making a credibility finding, the ALJ must make a finding based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1. But, an ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1.

With regard to a claimant's subjective symptoms, the regulations require an ALJ to consider certain factors, including: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve pain; 6) any measures used to relieve pain; and 7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186, at *3 ("20 CFR 404.1529(c) . . . describe[s] the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements").[3]

_____

3. SSR 16-3p, 2016 WL 1119029, supersedes SSR 96-7p, 1996 WL 374186. However, its effective date in March 2016 post-dates the ALJ's November 2015 decision. Neither party raises the issue of whether SSR 16-3p should be applied retroactively. In any event, the Court's evaluation of Plaintiff's credibility argument herein would be the same applying either SSR 16-3p or SSR 96-7p.

Although the ALJ must "consider" the listed factors, there is no requirement that the ALJ discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009); *Roberts v. Astrue*, 2010 WL 2342492, at *11 (N.D. Ohio).

Accordingly, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800-01 (6th Cir. 2004) (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Id.* (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Id.* (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("[i]t [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully supported, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987). In fact, as the Sixth Circuit has stated, "[w]e have held that an administrative law judge's credibility findings are virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (citation omitted).

Here, Plaintiff alleges the ALJ had "prejudice against [him]", and improperly based his credibility determination on Plaintiff's "history of sporadic work and earnings generally below

30

those which would represent substantial gainful activity" and "misstatement of the psychological

evidence . . . reducing the number of times [he] attended counseling sessions." (Doc. 13, at 19-20)

(citing Tr. 259). In support of this assertion, Plaintiff cites the ALJ's conclusion:

> Given all the factors analyzed in this case, including but not limited to the claimant's work history, the conservative treatments offered to the claimant and the relative lack of strongly positive clinical signs documented in treatment notes, a preponderance of the evidence supports a finding that he can perform a range of light exertion work activities with the postural, environmental and mental limitations set forth above.

(Doc. 13, at 19) (citing Tr. 266).

First, the paragraph of the ALJ's decision Plaintiff cites for support does not speak to

Plaintiff's credibility, but rather offers an explanation for why the RFC is supported by the record,

including Plaintiff's lack of past relevant work experience as it relates to transferability of job

skills pursuant to 20 C.F.R. § 416.968. (Tr. 266). Second, as explained above, the undersigned

rejects Plaintiff's argument regarding the number of therapy sessions he attended as without merit.

Third, within his credibility argument, Plaintiff also briefly alleges the case should be remanded

due to a new diagnosis, "which would explain the diffuse symptoms discounted by the ALJ." (Doc.

13, at 20). This is not well-taken because Plaintiff has not requested a sentence-six remand based

on new evidence. Fourth, the undersigned finds the ALJ appropriately analyzed Plaintiff's

credibility, through his hearing testimony, throughout the opinion. *See* Tr. 259-66.

RFC Determination

An individual's RFC is an assessment of "the most [he] can still do despite [his]

limitations." 20 C.F.R. § 416.945(a)(1). In making this determination, the ALJ must consider all

relevant evidence in the case record. *Id.*; Social Security Ruling ("SSR") 96–8p, 1996 WL 374184,

at *5. This evidence includes medical records, opinions of treating physicians, and the claimant's

own description of his limitations. 20 C.F.R. § 416.945(a)(3). This includes consideration of the

limiting effects of both severe and non-severe impairments. *Id.* § 416.945(e). The ALJ is required to evaluate every medical opinion received. *Id.* § 416.927(b). The Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC. 42 U.S.C. § 423(d)(5)(B); *see also Nejat v. Comm'r of Soc. Sec.,* 359 F. App'x 574, 578 (6th Cir. 2009) ("Although physicians opine on a claimant's residual functional capacity to work, ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."); 20 C.F.R. § 416.946(c) ("[T]he administrative law judge . . . is responsible for assessing your residual functional capacity.").

First, for the reasons stated above, the undersigned finds no error in the ALJ's analysis of opinions from treating sources. Second, contrary to Plaintiff's allegation (Doc. 13, at 21), the ALJ did include a restriction regarding binocular vision in the RFC. *See* Tr. 258 ("He is restricted to jobs where . . . binocular vision is not required."). Third, although Plaintiff is correct that additional work-restricting limitations were posed to the VE by both the ALJ and Plaintiff's counsel (Doc. 13, at 21-22), the ALJ is only required to adopt those restrictions he finds credible in the RFC. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact."). For those reasons, the undersigned finds Plaintiff has pointed to no error in the ALJ's RFC assessment.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI supported by substantial evidence and recommends the decision be affirmed.

s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).